UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

|  |  |  |
|---|---|---|
| STANTON E. ROSS, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 13-CV-2101-DDC-TJJ |
| vs. | ) | |
| | ) | |
| ADAM ROTHSTEIN, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

## REPORT AND RECOMMENDATION

### NOTICE

Within fourteen (14) days after being served with a copy of this Report and

Recommendation, any party, pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b)(2), may

file written objections to this Report and Recommendation.  A party must file any objections

within the fourteen-day period if that party wants to have appellate review of the proposed

findings of fact, conclusions of law, or recommended disposition.  If no objections are timely

filed, no appellate review will be allowed by any court.

## I.      NATURE OF THE MATTER BEFORE THE COURT

By Order dated September 10, 2014 (ECF No. 282), District Judge Daniel D. Crabtree

referred the following three motions to the undersigned Magistrate Judge for a report and

recommendation:

- Defendant Adam Rothstein's Motion for Summary Judgment as to Plaintiff's
Claim for Wrongful Disposition of Collateral, Rothstein's Right to a Deficiency Damages
Award, and Entitlement to Attorney's Fees (ECF No. 252);

- Plaintiff Stanton Ross's Motion for Summary Judgment Upon his Claim Against Defendant for Wrongful Disposition of Collateral Under K.S.A. 84-9-624 and 9-626 and Upon Defendant's Counterclaim for Fraud in the Inducement (ECF No. 255); and

- Plaintiff's First Motion for Order in Limine Excluding all Facts, Evidence, Testimony, Opinions and Inferences Offered by Defendant's Proffered Expert, Attorney Brian C. Underwood (ECF No. 261).

## II.   FINDINGS OF FACT

The following facts are either uncontroverted or, where controverted, are construed for purposes of summary judgment in the light most favorable to the party opposing the summary judgment motion.[1] Immaterial facts and factual averments not properly supported by the record are omitted.

Plaintiff Stanton Ross ("Ross") is a resident of Kansas, and is currently the Chairman of the Board, President, Chief Executive Officer and a shareholder of Infinity Energy Resources, Inc. ("Infinity"), a publicly traded company having its principal place of business in Johnson County, Kansas.

Defendant Adam Rothstein ("Rothstein") is a Connecticut resident and currently the adviser to several funds concentrating in the technology, media and entertainment sectors.

Ross called Rothstein on the evening of March 29, 2012, looking for a short-term loan of $210,000, initially from Rothstein's client Stephen Gans. Ross stated it would be a very short

---

[1] *Scott v. Harris*, 550 U.S. 372, 378 (2007).

term loan since his company, Infinity, was moments away from closing on a financing and the company owed him $300,000 in "back pay."

When the conversations turned toward the possibility of Rothstein making the loan to Ross, Rothstein told Ross that he would need the loan repaid by June 2012 for Rothstein's own estimated tax purposes.  On March 30, 2012, Rothstein loaned Ross $210,000 for 60 days, pursuant to written agreements discussed below.

In the conversations leading up to Rothstein agreeing to make the loan to Ross, Ross assured Rothstein that he would be able to promptly repay the loan, stating that Infinity was near to closing on a financing from which the $300,000 in "back pay" Infinity owed him would be funded. Ross further stated that he had other assets available to him.

At no time during the conversations leading up to Rothstein agreeing to make the loan to Ross did Ross tell Rothstein there were substantial tax liens filed against Ross that would make any compensation payment to Ross from Infinity subject to being consumed by taxing authorities.  However, Ross was aware of the Notice of Federal Tax Lien before he borrowed the $210,000 from Rothstein, and Ross testified at his deposition that the liens totaled around $500,000 at the time of his loan discussions with Rothstein.

At no time during the conversations leading up to Rothstein agreeing to make the loan to Ross did Ross tell Rothstein that Ross was counting on Infinity entering into a business relationship with a drilling partner that would result in Infinity being able to fund his "back pay."

At no time during the conversations leading up to Rothstein agreeing to make the loan to Ross did Ross state to Rothstein that Ross was counting on the value of Infinity's stock to rise, the sale of which would enable him to repay the loan.

At no time during the conversations leading up to Rothstein agreeing to make the loan to Ross did Ross state to Rothstein that any payment to Ross of "back pay" by Infinity would be subject to approval by the Infinity Board or any bonus would be subject to approval by the Infinity Compensation Committee.

Before Rothstein funded the $210,000 loan to Ross on March 30, 2012, Rothstein was never told in any manner by Ross himself, or by Stephen Gans, or by any Digital Ally Board member, or by anyone else, that Ross had tax problems and tax liens filed against him.

The one Digital Ally Board meeting in which Rothstein participated was in August 2012, over 4 months after Rothstein made the loan to Ross, and Rothstein participated by conference call on a limited subject, having no individual contact with anyone.

Stephen Gans was not elected to the Board of Digital Ally, Inc. until May 25, 2012.  At no time did Mr. Gans hear or otherwise learn from Stan Ross, from any other member of the Digital Ally Board, or from anyone else associated with Digital Ally, that Ross had problems with the IRS and tax liens filed against him.

The terms of the $210,000 loan from Rothstein to Ross were set forth in a "Secured Promissory Note" and "Pledge Agreement" signed by the parties. Under the terms of the Secured Promissory Note, the loan was to be repaid in full within 60 days, on or before May 31, 2012, and the interest for the Loan was to be paid by the transfer to Rothstein of 15,000 shares of Infinity stock.

By its terms, the loan became due on May 31, 2012, but Ross failed to repay the loan.

On August 27, 2012, at the request of Ross, the parties entered into a signed, written Forbearance Agreement, pursuant to which, among other things, (1) all obligations under the Secured Promissory Note were reaffirmed by Ross, (2) the default was acknowledged by Ross, and (3) the parties agreed the Loan due date would be extended to January 1, 2013, all for the additional consideration of 50,000 Consideration Shares of Infinity common stock to be delivered and transferred by Ross, in addition to the delivery and transfer by Ross of the original 15,000 Interest Shares, said transfers all to occur within seven (7) days of the execution of the Forbearance Agreement.

At the time of the Forbearance Agreement, the parties also entered into a (Superseding) Pledge Agreement, by which Ross pledged the remaining 77,310 shares of Infinity common stock that he owned.

Section 12.1 of the Forbearance Agreement provides that "Pledgee [Rothstein] may also, without notice except as specified below, sell the Pledged Collateral or any part thereof at a commercially reasonable price or prices and upon such other terms as Pledgee deems reasonable."

On January 1, 2013, the extended forbearance due date, Rothstein's business counsel e-mailed Ross notice and reiteration of his defaults under the agreements.

Ross did not repay the Loan on or before the forbearance extended due date, and his failure to repay the Loan continues to this date.

On January 30, 2013, Ross filed the underlying lawsuit against Rothstein in the District Court of Johnson County, Kansas. In his Petition, Ross asserted the following three claims

against Rothstein:  (1) fraudulent misrepresentation; (2) violation of the Kansas Consumer Protection Act ("KCPA"); and (3) defamation. Rothstein removed the case to this Court on February 25, 2013.  In his Answer (ECF No. 4), Rothstein asserted counterclaims for breach of the Secured Promissory Note; breach of the Forbearance Agreement, breach of the Superseding Pledge Agreement and foreclosure of security interest, breach of the Unconditional Guarantee, breach of the covenants of good faith and fair dealing, unjust enrichment, and fraud (including punitive damages).[2]

By Memorandum and Order dated September 11, 2013 (ECF No. 55), the court granted summary judgment in favor of Rothstein on Ross's fraud and KCPA claims. The court also granted summary judgment and entered judgment (ECF No. 56) in favor of Rothstein on his counterclaims for breach of the Secured Promissory Note; breach of the Forbearance Agreement; and breach of the (Superseding) Pledge Agreement and foreclosure of security interest in the amount of $210,000, plus 18% interest compounding monthly beginning September 5, 2012. The court further ordered that Rothstein was entitled to obtain from the Clerk of the Court the original Infinity Energy Resource, Inc. Certificate No. 3287 representing 77,310 shares of Infinity's common stock.

---

[2] Rothstein reasserted these same counterclaims in his Amended Answer (ECF No. 128) filed on January 6, 2014. However, in the Pretrial Order (ECF No. 247 at 19), Rothstein stated that he "does not intend to submit at trial any counterclaim against Plaintiff Ross for Rothstein's originally pleaded counterclaim of breach of the implied covenant of good faith and fair dealing or for unjust enrichment." He further stated he does not "intend to submit his claim against Plaintiff Ross under the Unconditional Guarantee, but reserves his position on using that document as evidence of the nature and extent of the attorney's fee obligation of Ross to Rothstein."

On September 12, 2013, the Clerk of the Court released to Rothstein the original Infinity Energy Resources, Inc. Certificate No. 3287, representing 77,310 shares of Infinity's common stock, which had previously been deposited with the Court (ECF No. 57).

On the morning of Monday, September 16, 2013, Rothstein deposited the certificate bearing the 77,310 Pledged Shares in an account with on-line broker Fidelity.com, which he had set up earlier in the year when he sold the 15,000 Infinity Interest Shares and 50,000 Infinity Consideration Shares he had previously received from Ross.

Rothstein sold the 77,310 Infinity shares in six different lots at prices ranging from $2.85 per share to $2.99 per share. The first sale occurred at 9:38 a.m. on September 16, 2013, when Rothstein sold 3,000 shares.  He sold all 77,310 shares within 40 minutes.  After the deduction of all brokerage fees and commissions, Rothstein realized $221,361.91 from the sale.

Rothstein opted to use online broker Fidelity.com to sell the Infinity shares in order to minimize transaction costs and preserve anonymity. His per trade commission rate at Fidelity.com was $7.95 a trade, and brokerage costs on the disposition of the 77,310 Pledged Shares totaled in the aggregate, across six trades, $47.70, or an average of $.00062 per share, or less than .03% of the realized value.

Because Infinity stock had averaged 16,640 shares traded per day in the prior week, Rothstein avoided showing the entire 77,310 Pledged Shares at one time for fear of spooking the market and possibly driving the share price down, and instead showed small blocks of the Infinity stock.  Infinity stock had closed the previous trading day at $2.92, but it opened on September 16, 2013 at $2.87 and was showing a bid for 100 shares at $2.86. Rothstein hit the bid with a small test order and it was filled on 3,000 shares at $2.86. The bid then dropped to $2.85,

but a buyer of some size appeared at that price so Rothstein sold 15,000 shares of the stock at $2.85. With the stock bid at $2.85 he decided to use limit orders to hit bids that showed 15,000 or more shares at that level or better.

At the same time that he used limit orders as described above, Rothstein tried to work smaller lots for higher prices. Over the course of the early morning he sold three lots of stock at $2.85 per share – one for 15,000 shares, one for 20,200 shares, and one for 25,110 shares. In addition to the initial sale of 3,000 shares at $2.86, he was able to make two additional sales higher than $2.85 in the first hour of trading comprised of another sale of 7,000 shares at $2.86 and a final sale of 7,000 shares at $2.99.

The published price quotations for Infinity common stock (IFNY), on September 16, 2013, show a trading "Volume" that day of 202,600 of IFNY shares, a "Low" price that day of $2.85, a "High" price of $3.39, an "Open" price of $2.87, and a "Close" price of $3.37.

In the months before and after Rothstein sold the 77,310 Infinity shares, published price quotations for Infinity common stock ("IFNY") show that Infinity was trading at the following "highs":

| | |
|---|---|
| 8/16/2013 | $3.52 |
| 8/23/2013 | 2.75 |
| 8/30/2013 | 2.81 |
| 9/6/2013 | 2.64 |
| 9/13/2013 | 2.92 |
| 9/20/2013 | 3.40 |
| 10/4/2013 | 3.74 |
| 10/11/2013 | 3.12 |
| 10/18/2013 | 3.20 |
| 10/25/2013 | 3.00 |

| | |
|---|---|
| 11/1/2013 | 2.50 |
| 11/8/2013 | 2.74 |
| 11/15/2013 | 1.41 |
| 11/22/2013 | 1.57 |
| 11/29/2013 | 1.49 |
| 12/6/2013 | 1.34 |

Infinity had 20,668,575 shares of common stock issued and outstanding as of March 28, 2013.  Infinity's common stock trades on the Over-the-Counter QB Tier Market "OTCQB" under the symbol "IFNY," as Infinity reports in its SEC filings. At no time in 2012, 2013 or thereafter has Infinity's common stock publicly traded or sold on any stock market other than the OTCQB.

The term "over-the-counter" ("OTC") refers to stocks that are not trading on a stock exchange, as OTC markets have never been a "place," but, in OTC markets, dealers act as market makers by quoting prices at which they will sell (ask or offer) or buy (bid) to other dealers and their clients or customers, with examples of OTC markets including the OTC Bulletin Board (OTCBB), which is a facility of the Financial Industry Regulatory Authority (FINRA), OTCQX, OTCQB, and OTC Pink.

On September 24, 2013, Rothstein served and filed his Notice of Disposition of Collateral and Intent to Pursue Deficiency in this case (ECF No. 59).   The notice advised Ross that Rothstein had sold and liquidated the 77,310 Infinity shares, leaving a deficiency of $179,947.85 as of the date of sale.

On October 1, 2013, Ross filed a motion for leave to file an amended complaint to assert a claim for wrongful disposition of collateral under K.S.A. 84-9-625.   At a December 17, 2013

telephone status conference, Magistrate Judge Waxse granted Ross's motion for leave to file his first amended complaint, extended the case deadlines, and set a March 28, 2014 deadline for filing any new dispositive motion on Ross's newly asserted wrongful disposition of collateral claim.  Ross filed his First Amended Complaint for Injunction and Damages (ECF No. 117) on December 23, 2013.

On April 9, 2014, the Court granted summary judgment in favor of Rothstein on Ross's defamation claim (ECF No. 201).

Rothstein thereafter filed a motion (ECF No. 120) seeking to clarify that only the deadline for filing any dispositive motion relating to his claim for a deficiency damages award or judgment was extended to March 28, 2014.  The Court entered an Order granting that clarification (ECF No. 130).  On March 11, 2014, upon the agreed motion of Rothstein, the Court entered a Second Amended Scheduling Order (ECF No. 188) extending the "deadline for filing dispositive motions" to May 28, 2014.  The Third Amended Scheduling Order (ECF No. 211) extended the "deadline for filing dispositive motions" to June 11, 2014.  The Fourth Amended Scheduling Order (ECF No. 243) further extended the "dispositive motion deadline" to the "earlier of two weeks after Ross and Rothstein are deposed, or July 7, 2014."   In the Pretrial Order (ECF No. 247), the dispositive motion deadline was extended to July 11, 2014. Rothstein indicated in the Pretrial Order that he reserved any objection he may have under the Court's prior scheduling orders as to the timeliness of any Ross dispositive motion that is unrelated to Ross's wrongful disposition claim or Rothstein's deficiency claim. Upon two more joint motions of the parties, the Court extended the dispositive motion deadline to July 15 and ultimately to July 17, 2014 (ECF Nos. 249 and 251).

Rothstein and Ross filed their respective motions for summary judgment on July 17, 2014.  Ross filed his motion seeking to exclude the affidavit of Rothstein's expert on July 18, 2014.

## III.  MOTION SEEKING TO EXCLUDE OPINIONS OF ROTHSTEIN'S EXPERT BRIAN C. UNDERWOOD

Ross has filed a motion in limine seeking to exclude "all facts, evidence, testimony, opinions and inferences" offered by Rothstein's proffered expert witness, attorney Brian C. Underwood ("Underwood").  Pertinent here is the Affidavit Constituting Expert Report of Underwood on Behalf of Defendant/Counterclaimant Rothstein (ECF No. 261-1) ("Affidavit"), which Rothstein has offered in support of his motion for summary judgment and in opposition to Ross's motion for summary judgment. In his limine motion, Ross requests that Underwood's Affidavit or any testimony be excluded for any purpose, whether at trial or hearing, or in the context of any motion submitted at or before trial.  He argues that the Affidavit testimony proffered by Underwood consists of nothing more than legal opinions, and that Underwood is not qualified to make such legal pronouncements.  In particular, Ross takes issue with the following four opinions in Underwood's Affidavit:

> Opinion No. 1: The OTCQB is a "recognized market" as that term is used in Kansas Uniform Commercial Code (UCC) statutes, K.S.A. 84-9-610; 84-9-611(1); and 84-9-627(b).
>
> Opinion No. 2: The pledged shares of [Infinity] stock, sold by Adam Rothstein on September 16, 2013 on the OTCQB, were "of a type customarily sold on a recognized market," as that term is used in Kansas UCC statute, K.S.A. § 84-9-611(d).
>
> Opinion No. 3: The pledged shares of [Infinity] stock, sold by Adam Rothstein on September 16, 2013 on the OTCQB, were sold "in the usual manner" on a "recognized market"; "at the price current" in a "recognized market"; and "in conformity with reasonable commercial practices among dealers in the type of

11

property that was the subject of the disposition," as those terms are used in Kansas U.C.C. statutes, K.S.A. 84-9-627(b)(1), (2) and (3).

Opinion No. 4: Every aspect of Adam Rothstein's sale of the Pledged Shares of [Infinity] stock on September 16, 2013, was "commercially reasonable," as that term is used in Kansas UCC statutes, including K.S.A. 84-9-607 (c); 84-9-610 (a) and (b); and 84-9-627(a).[3]

Rothstein argues that the Underwood Affidavit should be allowed to assist the trier of fact in understanding certain ultimate fact questions such as how the OTCQB actually functions and whether this market—where Rothstein liquidated the Infinity shares—matches the criteria associated with a "recognized market." He also asserts that the Affidavit will assist the trier of fact in determining whether the collateral disposition was commercially reasonable, by assisting in the understanding of whether the shares were "of a type customarily sold on a recognized market," whether they were sold "in the usual manner" on a "recognized market," whether the shares were sold "at the price current" in the "recognized market," whether they were sold "in conformity with reasonable commercial practices among [stock] dealers," and whether the facts and circumstances of Rothstein's sale and handling of the liquidation process was commercially reasonable.

Federal Rule of Civil Procedure 56(c)(1)(4) requires that an affidavit used to support or oppose a motion for summary judgment "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." The Tenth Circuit has recognized that an affidavit which fails to meet the

---

[3] Underwood Aff. (ECF No. 261-1) at 6, 9, 10, and 13.

requirements of Rule 56 is subject to a motion to strike, but formal defects are waived in the absence of a motion or other objection.[4]

An affidavit submitted by an expert, however, must also comply with Federal Rules of Evidence 702 to 704. In determining whether expert testimony is admissible, the court generally must first determine whether the expert is qualified "by knowledge, skill, experience, training, or education" to render an opinion.[5]  If sufficiently qualified, the court must then determine whether the other elements of Federal Rule of Evidence 702 are met.  A qualified expert may testify in the form of an opinion if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.[6]

Fed. R. Evid. 703 further provides that "[a]n expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted."  An expert's opinion "is not

---

[4] *Noblett v. Gen. Elec. Credit Corp.*, 400 F.2d 442, 445 (10th Cir. 1968).

[5] Fed. R. Evid. 702.

[6] Fed. R. Evid. 702.

objectionable just because it embraces an ultimate issue."[7] The proponent of expert opinion

testimony has the burden of establishing the admissibility of those opinions under Rule 702.[8]

"[R]ejection of expert testimony is the exception rather than the rule."[9] While Daubert

requires the Court to act as a gatekeeper for the admission of expert testimony, "[v]igorous cross-

examination, presentation of contrary evidence, and careful instruction on the burden of proof"

remain "the traditional and appropriate means of attacking shaky but admissible evidence."[10]

The Court has discretion "to determine *how* to perform its gatekeeping function under

*Daubert*."[11]   Although the most common method for fulfilling this function is a *Daubert* hearing,

such a process is not specifically mandated.[12] The district court may also satisfy its gatekeeper

role when asked to rule on a motion in limine, on an objection during trial, or on a post-trial

motion so long as the court has sufficient evidence to perform "the task of ensuring that an

expert's testimony both rests on a reliable foundation and is relevant to the task at hand."[13] In

this case, the parties do not request a hearing. The Court has carefully reviewed the motion in

limine, all of the legal memoranda on the motion filed by both parties, and the Underwood

---

[7] Fed. R. Evid. 704(a).

[8] *United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009).

[9] Fed. R. Evid. 702 advisory committee notes; *State Farm Fire & Cas. Co. v. Bell*, No. 12-2456-DDC-KGG, 2014 WL 3341124, at *3 (D. Kan. July 8, 2014).

[10] *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 596 (1993) (citation omitted).

[11] *Goebel v. Denver & Rio Grande W. R.R.*, 215 F.3d 1083, 1087 (10th Cir. 2000) (emphasis in original).

[12] *Id.* (citations omitted).

[13] *Id.* (quoting *Daubert*, 509 U.S. at 597).

Affidavit and finds this review to be sufficient to render a decision without conducting a hearing.[14]

### A.    Underwood's Qualifications

Ross first challenges the Underwood Affidavit on the basis that Underwood is not qualified to be an expert or to testify to or provide the opinions he sets forth in his Affidavit. Ross points out that Underwood does not once mention commercial law, the UCC, UCC Article 9, or Part 6 of Article 9 in his Affidavit. Ross further claims that Underwood lists no experience as a lawyer, lecturer, mediator, or professional witness involving commercial law, the UCC, UCC Article 9, Part 6 of UCC Article 9, or Article 9, Part 6 as it relates to the disposition of collateral after default.

Rothstein counters that Underwood has numerous qualifications, including having 25 years of experience in the broker-dealer and investment advisory industry, including as Chief Compliance Officer of A.G. Edwards and Wachovia Securities.  He points out that Ross opted to not depose Underwood, and to not designate any expert himself, either affirmatively or in rebuttal.

Rule 702 does not impose an "overly rigorous" requirement of expertise, recognizing that specialized knowledge may be acquired through a broad range of experience, skills or training.[15] The trial court should not exclude expert testimony simply because the court feels that the proffered witness is not the most qualified or does not have the specialization considered most

---

[14] *See State Farm*, 2014 WL 3341124, at *3 (hearing not necessary to render decision on motions to exclude expert testimony filed in connection with motion for summary judgment).

[15] *Squires ex rel. Squires v. Goodwin*, 829 F. Supp. 2d 1041, 1048 (D. Colo. 2011) (citing *United States v. Velasquez*, 64 F.3d 844, 849 (3d Cir. 1995)).

appropriate by the court.[16] As long as an expert stays "within the reasonable confines of his subject area," the lack of specialization affects the weight of his opinion and not its admissibility.[17] The qualification element of Rule 702, however, is not insignificant and must be satisfied as an essential prerequisite for the admissibility of the expert's opinions. The witness is required to possess "such skill, experience or knowledge in that particular field as to make it appear that his opinion would rest on substantial foundation and would aid the trier of fact in his search for truth."[18]

The Court has carefully reviewed Underwood's Affidavit, along with the attachments which detail his education, professional background, publications and speaking engagements, licenses and professional memberships, and list of cases in which he has testified as an expert at trial or deposition.  The Court concludes that Underwood has quite significant knowledge, skill, experience, training or education in the areas of the securities industry, the securities markets in general, over-the-counter securities, the OTC securities markets, FINRA, the OTCQB, OTC link ATS (OTC Link), and the customs and practices in the financial services industry.  Any lack of experience he might have had in cases involving the specific sections of the Kansas UCC at issue in the wrongful disposition of collateral claim in this case does not render him unqualified with regard to the securities industry, the securities markets, over-the-counter securities, the OTC securities markets, FINRA, the OTCQB, OTC link ATS (OTC Link), and the customs and practices in the financial services industry.  Underwood's expertise is pertinent to the issues in

---

[16] *Id.*

[17] *See P.S. ex rel. Nelson v. The Farm, Inc.*, 658 F. Supp. 2d 1281, 1291 (D. Kan. 2009) (citing *Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 970 (10th Cir. 2001)).

[18] *Markham v. BTM Corp.*, No. 08-4032-SAC, 2011 WL 1231084, at *16 (D. Kan. Mar. 30, 2011) (quoting *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 928 (10th Cir. 2004)).

the case.  The Court finds Underwood clearly qualified as an expert in these areas under Fed. R.

Evid. 702.

> ### B.     Legal Opinions

Ross next argues that Underwood's opinions are legal opinions which he is not

competent to render and which fail to edify the trier of fact and will only serve to confuse it.  He

cites the Ninth Circuit case, *Nationwide Transport Finance v. Cass Information Systems, Inc.*,[19]

as an example of a case where an expert's legal explanations and conclusions that "discuss the

UCC and/or apply the UCC to the facts" or "discuss non-UCC law and/or apply non-UCC law to

the facts" were excluded as legal conclusions.

Rothstein maintains that Underwood's Affidavit and opinions are admissible because

they satisfy Fed. R. Evid. 702, 703, and 704, and Underwood, while permissibly referring to the

law that frames the fact issues, states opinions that will help the trier of fact to understand the

evidence or to determine the fact issues.  He argues that under Fed. R. Evid. 704(a),

Underwood's expert opinion "is not objectionable just because it embraces an ultimate issue."

He contends that an expert can refer to the law in expressing his opinions.

An expert witness may testify regarding an ultimate issue of fact but may not offer an

opinion that "articulates the ultimate principles of law governing the deliberations of the jury."[20]

An expert witness may also refer to the law in expressing an opinion so long as the expert does

---

[19] 523 F.3d 1051, 1058–59 (9th Cir. 2008).

[20] *Specht v. Jensen*, 853 F.2d 805, 808 (10th Cir. 1988) (en banc).

not "state legal conclusions drawn by applying the law to the facts."[21]  Witnesses may not "give

an opinion on a question of law," because the court alone is the "arbiter of the law and its

applicability."[22] To hold otherwise would permit multiple statements of the law to "intolerably

confound the jury."[23] Thus, while Fed. R. Evid. 704 provides that "[a]n opinion is not

objectionable just because it embraces an ultimate issue," the embraced issues are limited to

*factual* rather than legal issues.[24] "The basis for this distinction is that testimony on the ultimate

factual questions aids the jury in reaching a verdict; testimony which articulates and applies the

relevant law, however, circumvents the jury's decision-making function by telling it how to

decide the case."[25]

Applying this law to the four opinions expressed by Underwood in his Affidavit, the

Court finds that these opinions embrace issues that are not limited to factual issues, but rather

embrace ultimate legal issues.[26] The Court agrees with Ross that under *Specht*[27] it would be

improper for the Court to allow Underwood's opinion that the OTCQB is a "recognized market,"

---

[21] *A.E. By & Through Evans v. Indep. Sch. Dist. No. 25*, 936 F.2d 472, 476 (10th Cir. 1991).  *See also Okland Oil Co. v. Conoco Inc.*, 144 F.3d 1308, 1328 (10th Cir. 1998) ("Generally, an expert may not state his or her opinion as to legal standards nor may he or she state legal conclusions drawn by applying the law to the facts.").

[22] *Specht*, 853 F.2d at 808.

[23] *Id.*

[24] *Id.* (emphasis added).

[25] *Id.*

[26] In this Court's experience, the 15-page Underwood Affidavit is highly unusual and extends far beyond what would ordinarily be accepted and considered on summary judgment.  The Underwood report reads like a treatise and the entire report has been presented in the form of an affidavit, apparently with the expectation that the entire report would be filed in support of summary judgment.

[27] *Specht*, 853 F.2d at 808.

as that term is used in Kansas Uniform Commercial Code ("UCC"). This is an opinion on a question of law and articulates a legal conclusion drawn by applying the law to the facts.[28] The Court finds the *Nationwide* case cited by Ross to be on point and persuasive on this issue. In *Nationwide Transport Finance*,[29] the Ninth Circuit affirmed the district court's exclusion of an expert's legal explanations and conclusions in "sections that discuss the UCC and/or apply the UCC to the facts of this case."[30] The court found that the expert's legal conclusions "not only invaded the province of the trial judge, but constituted erroneous statements of law."[31] This is very similar to the legal conclusions being offered by Underwood in this case. Underwood is not just identifying issues of law or referring to the applicable law in expressing his opinions, rather he is providing his opinions in the form of legal conclusions he reaches by applying those issues of law to the facts presented in this case.

While Underwood may not provide an opinion that defines the legal parameters for the fact-finder, he may, however, testify about factual issues that will assist the Court in making a legal determination. In this case, the Court may consider Underwood's statements in his Affidavit regarding relevant factual issues such as the operation, function, and trading of stocks on over-the-counter securities markets generally, as well as the OTCQB in particular and how it functions, operates, and how stocks trade on the OTCQB. The Court also will consider statement made in Underwood's Affidavit regarding the details of Rothstein's actual trades of

---

[28] *A.E. By & Through Evans*, 936 F.2d at 476.

[29] 523 F.3d 1051, 1058–59 (9th Cir. 2008).

[30] *Id.* at 1058.

[31] *Id.* at 1059.

the Infinity shares at issue.  Such testimony may assist the Court in reaching its own legal

conclusion whether the OTCQB is a "recognized market" under the Kansas UCC.

With regard to Underwood's opinion that the pledged shares of Infinity stock, sold by

Rothstein on September 16, 2013 on the OTCQB, were "of a type customarily sold on a

recognized market," under K.S.A. 84-9-611(d), the Court likewise finds this to constitute an

impermissible legal conclusion.  Similarly, the Court finds that Underwood's opinions that the

pledged shares of Infinity stock were sold "in the usual manner" on a "recognized market"; "at

the price current" in a "recognized market"; and "in conformity with reasonable commercial

practices among dealers in the type of property that was the subject of the disposition," as those

terms are used in K.S.A. 84-9-627(b)(1)–(3), are all impermissible legal conclusions.  Again,

however, as noted previously, the Court may consider Underwood's factual statements regarding

relevant issues such as the operation, function, and trading of stocks on the OTCQB, as well as

the details of Rothstein's actual trades of the Infinity shares at issue.

Finally, the Court again agrees with Ross that Underwood is asserting an improper legal

opinion when he opines that every aspect of Rothstein's sale of the Infinity shares on September

16, 2013, was "commercially reasonable," as that term is used in K.S.A. 84-9-607(c); 84-9-

610(a)–(b); and 84-9-627(a).

Accordingly, for the foregoing reasons, the undersigned Magistrate Judge recommends

that Ross's First Motion for Order in Limine Excluding all Facts, Evidence, Testimony, Opinions

and Inferences Offered by Defendant's Proffered Expert Attorney Brian C. Underwood be

granted in part and denied in part, and that Underwood's four opinions set forth in his Affidavit

be excluded from trial and from being considered by the Court in conjunction with the rulings on

the motions for summary judgment.  The Court will disregard Underwood's legal opinions in the recommended rulings herein on the pending cross motions for summary judgment.[32]  The Court will, however, consider the factual information provided by Underwood in his Affidavit, particularly as to trading on the OTC markets and the OTCQB in particular, in making its own legal conclusions.

## IV.     CROSS MOTIONS FOR SUMMARY JUDGMENT

The parties have filed cross motions for summary judgment.  In Defendant Rothstein's motion, he requests that the Court enter summary judgment on Ross's claim for wrongful disposition of collateral.  Rothstein also requests that the Court determine and order that he is entitled to a deficiency determination and award as to his damages, as well as his reasonable attorney's fees and expenses.  Finally, Rothstein requests that the Court order that Ross is not entitled to recover from Rothstein any attorney's fees Ross has incurred in this matter.

In his motion, Plaintiff Ross moves the Court for summary judgment upon his claim against Rothstein for wrongful disposition of collateral under K.S.A. 84-9-625 and 9-626 and upon Rothstein's counterclaim against Ross for fraud in the inducement.

### A.     Summary Judgment Standard

Under Fed. R. Civ. P. 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to

---

[32] *See U.S. ex rel. Maxwell v. Kerr-McGee Chem. Worldwide, LLC*, No. 04CV01224PSFCBS, 2006 WL 2053534, at *4 (D. Colo. July 21, 2006) (district court is free to disregard any inadmissible portions of expert report in deciding motion for summary judgment); *City of Chanute, Kan. v. Williams Natural Gas Co.*, 743 F. Supp. 1437, 1445 n.4 (D. Kan. 1990) ("A court is free to disregard the inadmissible parts and consider the rest of the [expert's] affidavit.").

judgment as a matter of law." Rule 56(c)(1) further provides that the party asserting that a fact

cannot be or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

"The court need consider only the cited materials, but it may consider other material in the

record."[33] When ruling on a motion for summary judgment, a court must view the evidence and

draw reasonable inferences in the light most favorable to the party opposing the summary

judgment motion.[34]

A dispute is genuine if "the evidence is such that a reasonable jury could return a verdict

for the nonmoving party" on the issue.[35] Although the court views the evidence and draws

reasonable inferences therefrom in the light most favorable to the nonmoving party, summary

judgment is warranted if the moving party "points out a lack of evidence to support an essential

element of the claim and the nonmovant cannot identify specific facts that would create a

genuine issue."[36]

---

[33] Fed. R. Civ. P. 56(c)(3).

[34] *Kerber v. Qwest Grp. Life Ins. Plan*, 647 F.3d 950, 959 (10th Cir. 2011).

[35] *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[36] *Water Pik, Inc. v. Med-Systems, Inc.*, 726 F.3d 1136, 1143–44 (10th Cir. 2013).

When the parties file cross motions for summary judgment, the court must analyze each motion individually and on its own merits.[37]  But where the cross motions overlap, the court may address the legal arguments together.[38]  The court is also "entitled to assume that no evidence needs to be considered other than that filed by the parties, but summary judgment is nevertheless inappropriate if disputes remain as to material facts."[39]

### B.      Wrongful Disposition of Collateral Claim

Ross and Rothstein each seek summary judgment on Ross's claim for wrongful disposition of the 77,310 shares of Infinity common stock, which Ross had pledged to Rothstein as collateral.  Rothstein seeks a determination by the Court that his sale disposing of the pledged shares was commercially reasonable and in compliance with Kansas UCC Article 9 Part 6. Specifically, Rothstein contends (1) the sale was in accordance with the parties' valid and enforceable post-default written agreement regarding disposition of the Pledged Shares, in which agreement Ross effectively waived notice, and (2) the sale was commercially reasonable as being conducted on a "recognized market," and/or as being conducted in conformity with reasonable commercial practices.

Conversely, Ross argues that summary judgment is warranted on his wrongful disposition of collateral claim because he has shown that Rothstein failed to give him the required prior notice of the sale of 77,310 shares of the Infinity stock, failed to obtain a written and

---

[37] *Buell Cabinet Co. v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979) ("Cross-motions for summary judgment are to be treated separately; the denial of one does not require the grant of another.").

[38] *Berges v. Standard Ins. Co.*, 704 F. Supp. 2d 1149, 1155 (D. Kan. 2010).

[39] *Atlantic Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000) (quoting *James Barlow Family Ltd. P'ship v. David M. Munson, Inc.*, 132 F.3d 1316, 1319 (10th Cir. 1997)).

authenticated waiver of such notice after default in payment of the obligation secured by that collateral, and failed to sell the collateral on a "recognized market." Ross contends that under K.S.A. 84-9-626, Rothstein has the burden to show either that he complied with each of the provisions of K.S.A. 84-9-601 through 9-628 relating to the enforcement of security interests and/or the disposition of collateral, or that a fully-compliant disposition of the collateral at issue would have produced less in proceeds than were actually received through non-compliance. He contends that, as a result of Rothstein's inability to satisfy the requirements of K.S.A. 84-9-626(4) by proving that the amount of proceeds that would have been realized from the sale of such collateral would have been less had he actually complied with the notice and all other requirements of K.S.A. Chapter 84, Rothstein's claim for the recovery of any deficiency has been extinguished as a matter of law.

### 1.    Waiver of Notice of Collateral Disposition

Ross contends that because Rothstein did not give him any notice before the September 16, 2013 sale disposing of the 77,310 pledged Infinity shares constituting the collateral, Rothstein has the burden of proving that he was somehow excused from doing so. To satisfy that burden, Ross claims Rothstein must show either that notice was unnecessary because the sale qualified for one of the exceptions to notice that appear in K.S.A. 84-9-611(d), or that Ross in fact waived his right to notification of disposition of the collateral.

K.S.A. 84-9-626(3) limits the amount of a deficiency if a secured party fails to prove he acted in compliance with the provisions relating to collection, enforcement, disposition or acceptance. It provides:

> [I]f a secured party fails to prove that the collection, enforcement, disposition, or acceptance was conducted in accordance with the provisions of this part relating

to collection, enforcement, disposition, or acceptance, the liability of a debtor or a secondary obligor for a deficiency is limited to an amount by which the sum of the secured obligation, expenses, and attorney fees exceeds the greater of:

(A)   The proceeds of the collection, enforcement, disposition, or acceptance; or

(B)   the amount of proceeds that would have been realized had the noncomplying secured party proceeded in accordance with the provisions of this part relating to collection, enforcement, disposition, or acceptance.

K.S.A. 84-9-626(4) further provides "[t]he amount of proceeds that would have been realized is equal to the sum of the secured obligation, expenses, and attorney fees unless the secured party proves that the amount is less than that sum."

One of the provisions related to disposition of collateral is K.S.A. 84-9-611, which requires a secured party who disposes of collateral to send a "reasonable authenticated notification of disposition" to the debtor.  However, the notice requirement does not apply "if the collateral is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market."[40]  K.S.A. 84-9-612 further provides that whether a notification is sent within a reasonable time is a question of fact, but a notification of disposition sent after default and 10 days or more before the earliest time of disposition set forth in the notification is a reasonable time before the disposition.

In this case, the parties agree that Ross received no prior notice of Rothstein's September 16, 2013 disposition of the Infinity shares.  Rothstein argues that no notice was required because Ross waived any right to notice of the disposition of the collateral in the August 27, 2012 Pledge Agreement.  Section 12.1 of the Pledge Agreement allowed Rothstein "without notice except as

---

[40] K.S.A. 84-9-611(d).

specified below, [to] sell the Pledged Collateral or any part thereof at a commercially reasonable price or prices and upon such other terms as Pledgee [Rothstein] deems reasonable."

### a)       Whether Waiver Was Post Default

Ross argues that any waiver of notice that may appear in the Pledge Agreement cannot be deemed to be a waiver entered into and authenticated by Ross "after default" within the meaning of K.S.A. 84-9-624(a).  According to Ross, any waiver appearing in a document which Ross executed on August 27, 2012 cannot be deemed to be a "post-default waiver" when in fact the default did not occur until January 1, 2013.

Rothstein counters that Ross ignores the controlling provisions in the Forbearance Agreement by which he not only acknowledged, but reiterated the May 31, 2012 default date, and specifically agreed there was no waiver by Rothstein of his rights with respect to that existing default date.  Rothstein points out that there is no language in the Forbearance Agreement stating that the "term" of the loan was extended to January 1, 2013, but rather the Forbearance Agreement only states that Rothstein would forbear from exercising his rights until January 1, 2013.

K.S.A. 84-9-624(a) governs the waiver by a debtor of his right to notice of the disposition of collateral.  It provides that "[a] debtor or secondary obligor may waive the right to notification of disposition of collateral under K.S.A. 2009 Supp. 84-9-611 and amendments thereto only by an agreement to that effect entered into and authenticated after default."

Here, the Court finds that Ross defaulted on the Promissory Note on May 31, 2012.  His subsequent execution of the (Superseding) Pledge Agreement on August 27, 2013, which contained the waiver of notice provision in Section 12.1, constitutes a post-default waiver of his

right to notification of disposition of the collateral under K.S.A. 84-9-624(a).  The Forbearance

Agreement, executed the same day as the Pledge Agreement, recited that May 31, 2012 was the

date that Ross failed to pay Rothstein the outstanding principal balance resulting in an "Event of

Default."  It did not, as Ross argues, extend the maturity date to January 1, 2013, but only

provided that Rothstein would forbear taking any remedial action on the note in connection with

the non-payment default until January 1, 2013.  Ross's waiver of his right to notice of disposition

of the collateral, contained in Section 12.1 of the (Superseding) Pledge Agreement, was therefore

a post-default waiver.

### b)       Whether Waiver Excepted Notices of Sale

Ross next argues that the (Superseding) Pledge Agreement language allowing Rothstein

to sell the collateral without notice has an exception for notices of sale.  Paragraph 12.1 provides

that upon default, Rothstein may "without notice except as specified below, sell the Pledged

Collateral or any part thereof at a commercially reasonable price or prices and upon such other

terms as Pledgee deems reasonable."  Ross contends that the phrase "except as specified below"

is referring to succeeding paragraph 17, which expressly requires all notices, including "any

notice of default or notice of sale" under the Pledge Agreement, be in writing and served in a

particular manner. Ross contends paragraph 17 thus provides an exception for notices of sale and

Rothstein must provide him with written notice of the sale of the Infinity shares.

Rothstein disagrees with Ross's interpretation of the "specified below" language in

paragraph 12.1.  He argues that there is no provision immediately following that paragraph

which would constitute an exception "specified below."  He also argues that paragraph 17

concerns merely the mechanics of notice and only comes into play for notices actually required

under the Pledge Agreement, if any, and does not resurrect a requirement that Rothstein give notice when it sells the pledged collateral.

Based upon its review of the (Superseding) Pledge Agreement, the Court does not find paragraph 17 to create a notice of sale requirement, and thus an exception to paragraph 12.1's provision that permits Rothstein "without notice except as specified below" to sell the Pledged Collateral.  The Court reads paragraph 17 to only specify the manner in which notice is to be provided, if such notice is required by the Pledge Agreement.  It does not create a notice requirement, but only provides that if such notice is required, it must be in writing and delivered in a particular manner.  The Court further finds that paragraph 12.1's "except as specified below" language does not refer to all the succeeding paragraphs 13 through 25, including paragraph 17's requirement that notices be in writing and served in a particular manner. The Court reads "except as specified below" to refer to any exceptions that would be listed, if any, immediately following that paragraph and before the next paragraph.  While it would have been clearer had the parties had indicated "None" in the space following paragraph 12.1 of the Pledge Agreement, this does not change the Court's opinion that the parties did not intend for paragraph 17 to be an exception "specified below" in paragraph 12.1.  Instead, the Court finds that paragraph 17 simply provides the mechanics, i.e., notices must be in writing, with regard to notices otherwise required under the Pledge Agreement.  Accordingly, the Court finds that, pursuant to paragraph 12.1 of the (Superseding) Pledge Agreement, Ross waived his right to receive prior notification of Rothstein's sale of the 77,310 shares of Infinity stock on September 16, 2013.

**2.    Whether Defendant Rothstein's Disposition of Collateral Was Commercially Reasonable**

In order to avoid K.S.A. 84-9-626's limit on the amount of deficiency, Rothstein also must show that his disposition of the 77,310 shares of Infinity stock pledged as collateral was commercially reasonable under K.S.A. 84-9-610 and 9-627. The parties agree that Infinity's common stock trades on the Over-the-Counter QB Tier Market "OTCQB," and that at no time in 2012, 2013 or thereafter has Infinity's common stock publicly traded or sold on any stock market other than the OTCQB. The parties further agree that Rothstein sold the 77,310 share of Infinity common stock in six different lots on September 16, 2013, by trading them on the OTCQB through the registered online broker Fidelity.com. What the parties dispute is whether Rothstein's disposition of the Infinity shares by trading them on the OTCQB was commercially reasonable. Rothstein maintains that the disposition was commercially reasonable because the OTCQB is a "recognized market" under K.S.A. 84-9-627(b). Ross, however, argues that the OTCQB is not a "recognized market" because the share prices on the OTCQB are subject to individual negotiation.

K.S.A. 84-9-610 governs the disposition of collateral after default. It provides, in pertinent part, that:

> (a) **Disposition after default.** After default, a secured party may sell, lease, license, or otherwise dispose of any or all of the collateral in its present condition or following any commercially reasonable preparation or processing.

> (b) **Commercially reasonable disposition**. Every aspect of a disposition of collateral, including the method, manner, time, place, and other terms, must be commercially reasonable. If commercially reasonable, a secured party may dispose of collateral by public or private proceedings, by one or more contracts, as a unit or in parcels, and at any time and place and on any terms.

Whether a disposition of collateral is commercially reasonable is governed by K.S.A. 84-9-627, which provides that:

> (a) **Greater amount obtainable under other circumstances; no preclusion of commercial reasonableness**. The fact that a greater amount could have been obtained by a collection, enforcement, disposition, or acceptance at a different time or in a different method from that selected by the secured party is not of itself sufficient to preclude the secured party from establishing that the collection, enforcement, disposition, or acceptance was made in a commercially reasonable manner.

> (b) **Dispositions that are commercially reasonable**. A disposition of collateral is made in a commercially reasonable manner if the disposition is made:

>> (1)   In the usual manner on any recognized market;

>> (2)   at the price current in any recognized market at the time of the disposition; or

>> (3)   otherwise in conformity with reasonable commercial practices among dealers in the type of property that was the subject of the disposition.

Rothstein admits that no OTC market is an "exchange," but argues that his disposition of the collateral was made in a commercially reasonable manner because it was "[i]n the usual manner on any recognized market" under K.S.A. 84-9-627(b)(1).  Although no section of the Kansas UCC defines "recognized market," Comment 9 to K.S.A. 84-9-610 provides the following explanation of the term:

> A "recognized market," as used in [§ 9-610(c)] and Section 9-611(d) is one in which the items sold are fungible and prices are not subject to individual negotiation. For example, the New York Stock Exchange is a recognized market. A market in which prices are individually negotiated or the items are not fungible is not a recognized market, even if the items are the subject of widely disseminated price guides or are disposed of through dealer auctions.

"Fungible goods" are defined by K.S.A. 84-1-201(18) as "goods of which any unit, by nature or usage of trade, is the equivalent of any other like unit."  Courts consider shares of stock of the

same class to be fungible as each certificate denotes identical rights.[41]  Each share of Infinity

stock sold by Rothstein was common stock interchangeable with every other share sold.

Accordingly, the Court finds that the Infinity shares sold by Rothstein were fungible goods.

    The next question in determining whether the OTCQB is a "recognized market" is

whether the prices are individually negotiated or subject to individual negotiation.  This is a more

difficult question as it requires greater understanding of the OTCQB market on which Rothstein

sold the Infinity shares.  The parties do not cite, nor has the Court found, any case in which any

court has addressed whether collateral securities sold on the OTCQB were sold on a "recognized

market" under the UCC.  Comment 9 identifies stock exchanges such as the New York Stock

Exchange ("NYSE") as a "recognized market" for the purpose of establishing that a disposition

of collateral is made in a commercially reasonable manner.[42]  Other courts have found major

stock exchanges to be "recognized markets."[43]  The law, however, is less clear whether other

securities markets such as the OTCQB would likewise be considered a "recognized market."

Scholarly commentators have further defined a "recognized market" for purposes of collateral

dispositions under the UCC as "one in which the items sold are fungible and prices are not

individually negotiated. Moreover, even if the items sold on a market are subject to widely-

---

[41] *See Gail v. United States*, 58 F.3d 580, 585 n.7 (10th Cir. 1995) ("In the case of securities, for example, it is a simple thing to replace shares of stock because they are fungible–one share of General Motors stock is as good as any other."); *Ohio Drill & Tool Co. v. Johnson*, 498 F.2d 186, 194 (6th Cir. 1974) ("Equity securities are treated as fungible items. 'Since all shares of a corporation's stock are alike and interchangeable, it is of no consequence whether those bought and sold are represented by the same certificates.'").

[42] K.S.A. 84-9-610, cmt. 9.

[43] *See Layne v. Bank One, Ky., N.A.*, 395 F.3d 271, 280–81 (6th Cir. 2005) (sale of the stock on the NASDAQ, a recognized market, was commercially reasonable); *Suffield Bank v. LaRoche*, 752 F. Supp. 54, 59 (D.R.I. 1990) (collateral stock sold on American Stock Exchange was commercially reasonable as it was sold on a "recognized market").

disseminated price guides or are sold through dealer auctions, that market is not a 'recognized market' if its prices are individually negotiated or the items sold on it are not fungible."[44] Another law review article has described a "recognized market" as "one where there is no haggling over price, no competitive bidding, and where marketing efforts will not affect the price received at the sale."[45]

Ross argues that the OTCQB is not a "recognized market" under K.S.A. 84-9-627(b)(1)–(2) because Rothstein sold the 77,310 infinity shares in less than 40 minutes on September 16, 2013 using an OTC "quotation service." He argues that Rothstein's use of limit orders to hit bids that allowed 15,000 or more shares at the bid price of "$2.85" and his attempt to work smaller lots for higher prices shows that he used human connivance and powers of manipulation to sell the 77,310 Pledged Shares for what he says was the "best" price obtainable. Ross also makes several statements about the OTCQB, such as there is no central "exchange" for securities that trade in the OTCQB and a broker-dealer must communicate and trade directly with other broker-dealers. He also states that "in order to notify other broker-dealers that they are willing to trade a security at a particular price, broker-dealers post their 'quotes' on an inter-dealer Quotations system such as OTC Link® ATS." In support of these statements, Ross offers three exhibits consisting of screen prints from the OTC Market's website entitled "Market 101 – Introduction"

---

[44] Alan M. Christenfeld and Barbara M. Goodstein, *Enforcing Security Interests Under Article 9 of the UCC*, 242 N.Y.L.J. 5 (Aug. 6, 2009).

[45] Maury B. Poscover, *A Commercially Reasonable Sale Under Article 9: Commercial, Reasonable, and Fair to All Involved*, 28 Loy. L.A. L. Rev. 235, 238 n.9 (1994) (citing *Kitmitto v. First Pa. Bank, N.A.*, 518 F. Supp. 297, 302–03 (E.D. Pa. 1981)).

(ECF No. 272-4), "Market 101 – Market Structure" (ECF No. 272-3), and "Market 101 – Trading" (ECF No. 272-5).[46]

The Court has reviewed these screen prints from the OTC Market's website and questions the authenticity and admissibility of the statements contained therein.[47]  Even setting aside the admissibility of these screen prints, the Court finds the information in them does not support Ross's position that the OTCQB is distinguishable from other "recognized" securities markets because prices of OTCQB securities are individually negotiated, and therefore the OTCQB should not be a considered a "recognized market" under K.S.A. 84-9-627(b)(1) or (2). The Court notes that the "Market 101 – Market Structure" screen print from the OTC Market's website actually states that investors in OTCQB marketplaces can buy and sell securities "in a manner almost identical to that of trading NYSE or NASDAQ securities, through the broker of their choice (institutional, online, retail)."[48]

The OTC Markets "Market 101 – Trading" screen shot again states that "trading an OTCQX, OTCQB or OTC Pink security is comparable to trading a security on NYSE or NASDAQ. Investors may buy and sell securities through the institutional, online or retail broker-dealer of their choice."  It further provides a detailed explanation of the trading process for an individual investor.

---

[46] Rothstein also objects to the OTC Market screen prints as unauthenticated and otherwise inadmissible hearsay.

[47] Ross Ex. 5 (ECF No. 272-5).  "For purposes of summary judgment, the court does not consider unsworn, unauthenticated documents, including printed copies of web sites." *ColtTech, LLC v. JLL Partners, Inc.*, 538 F. Supp. 2d 1355, 1357 n.3 (D. Kan. 2008).

[48] *Id.*

Rothstein argues that the OTCQB is a "recognized market" under K.S.A. 84-9-627(b)(1)–(2), and disputes the descriptions provided by Ross.  According to Rothstein's expert witness Underwood, when Rothstein sold the Infinity shares, his registered broker-dealer electronically transmitted limit orders to sell the collateral to OTC Link for execution on OTCQB.  Underwood describes the OTCQB as an "electronic inter-dealer quotation system that displays real-time quotes, last-sale prices, and volume information for many OTC equity securities that are not listed on a national securities exchange."[49] "Only broker-dealers qualified with FINRA as market makers can apply to quote securities on the OTCQB."[50] "Under the OTCQB's eligibility rule, companies that want to have their securities quoted on the OTCQB must seek the sponsorship of a market maker as well as file current financial reports with the SEC or with their banking or insurance regulator."[51]  Underwood further states in his Affidavit that the "OTCQB market is clearly a market where 'marketable securities' are sold," and is a market where there are "standardized price quotations."[52]

Underwood states in his Affidavit that there is no difference in the manner in which stocks are traded on the NYSE, other exchanges, or on ATS that is material to the issue of whether a particular market is a recognized market for purposes of Article 9 of the UCC.[53] In all instances, the process involves offers to sell at a specific price and a specific size ("Ask") and offers to buy at a specific price and a specific size ("Bid"). The best bid and the best offer

---

[49] Underwood Aff. (ECF No. 253-3) ¶ 28.

[50] Underwood Aff. ¶ 29.

[51] Underwood Aff. ¶ 29.

[52] Underwood Aff. ¶¶ 39–40.

[53] Underwood Aff. ¶ 46.

establish the prevailing market, which is publicly disseminated. If there is a Bid and an Ask at the same price, a sale occurs; if there is a spread between the Bid and Ask, then either one or both of the parties can change their Bid or Ask to eliminate the spread, and a sale occurs; or no sale occurs. In all instances the entire process is subject to all applicable federal securities laws, the rules and regulations of the SEC, all applicable FINRA rules and regulations, as well as to on-going SEC and FINRA oversight.[54]

Underwood also states in his Affidavit that the sale of the Infinity shares traded on the OTCQB "were sold in a recognized market at standardized prices; and the sale of the shares [was] not the subject of individual negotiation."[55]  His conclusion that the transactions occurred on a recognized market at standardized prices is based upon documentation consisting of a Yahoo! Finance printout of historical trading data from August 16 to October 14, 2012.

Rothstein argues that the fact that OTC Link (the trading platform) offers a feature where communications and trade negotiations can occur between broker-dealers with respect to a possible private transaction in the shares of the common stock of a publicly traded company does not cause OTCQB to cease to be a recognized market under the UCC. Private parties, whether individuals, companies, or broker-dealers always have the ability to negotiate private transactions outside a recognized market. That occurs daily, most frequently when either the size of a proposed transaction is so great that it could disrupt the trading on a recognized market, or where the buying party seeks a price below the prevailing price on the recognized market.

---

[54] *Id.*

[55] Underwood Aff. ¶ 41.

However, that is not what occurred with the Infinity shares at issue here.  The limit orders sold in lots by Rothstein are consistent with public trading on the NYSE.

Although the Court rejects the ultimate legal conclusions offered by Rothstein's expert Underwood, the Court finds that he has substantial experience with trading on the various securities markets, including the OTC markets.  The Court finds his factual statements as to how the OTCQB works and how the Infinity securities were traded on that market useful in its analysis.  The Court further finds that his factual statements and explanations support the conclusion that the Infinity shares at issue were sold at standardized prices and the sale of those shares was not the subject of individual negotiation.  Ross has not offered any evidence to refute Underwood's statements that Rothstein's actual sales of the Infinity shares (in six lots) at issue here were not the subject of individually negotiated transactions.

The Court therefore finds that the Infinity shares sold by Rothstein on September 16, 2013 were sold at standardized prices and the sales of the lots of shares were not the subject of individual negotiation.  Even if, as Ross has suggested, it is possible for sales of OTCQB securities to be individually negotiated, this is just one option for a broker-dealer to execute a trade order.  Trading securities on the OTCQB is sufficiently similar to trading on a "recognized market" like the New York Stock Exchange, which is cited as an example of a "recognized market" in Comment 9 to K.S.A. 84-9-610, so as to conclude that it is a "recognized market" for purposes of determining the commercial reasonableness of a collateral disposition under UCC Article 9.

The Court thus concludes that the OTCQB is a "recognized market" and Rothstein's sale of the Infinity stock on the OTCQB was therefore commercially reasonable under K.S.A. 84-9-

627(b).   The Court finds this conclusion is further supported by the undisputed fact that the

OTCQB is the only place where Infinity's common stock has been publicly traded or sold, and

by a reference to the OTCQB on the Securities and Exchange Commission's ("SEC") website.

In an answer to a question inquiring when a company may file a registration statement for the

resale by the investors of securities sold in a private equity line financing, the official SEC

answer includes the following statement:

> We will not object that a private transaction is not "completed" based on the lack
> of a fixed price if the agreement provides for pricing based on a formula tied to
> market price and there is an existing market for the securities as evidenced by
> trading on a national securities exchange *or through the facilities of the OTC*
> *Bulletin Board or the OTCQX or OTCQB marketplaces of OTC Link ATS*.   [May
> 16, 2013].[56]

From this reference, the SEC appears to recognize OTCQB as a marketplace for the purpose of

determining the public market price when issuers are raising capital.

In addition to arguing that his disposition of the Infinity shares was commercially

reasonable under K.S.A. 84-9-627(b)(1), Rothstein also argues that it was commercially

reasonable under K.S.A. 84-9-627(b)(2) and (b)(3).   Because the Court concludes that the

OTCQB is a "recognized market" under subsection (b)(1), it need not address whether Rothstein

has satisfied the other two subsections by which he can show that his disposition of the collateral

was commercially reasonable.

The Court thus finds that Rothstein has sufficiently proven that his disposition of the

77,310 shares of Infinity common stock was conducted in accordance with the provisions of Part

---

[56] U.S. Securities and Exchange Commission, Questions and Answers of General Applicability,
Question 139.13, http://www.sec.gov/divisions/corpfin/guidance/sasinterp.htm (last visited Dec. 17,
2014) (emphasis added).

6 of Kansas UCC Article 9.  He is thus entitled to summary judgment in his favor on Ross's

claim for wrongful disposition of collateral and a deficiency damages determination and award.

### C.     Attorney's Fees

#### 1.   Whether Rothstein is Entitled to Attorney's Fees

Rothstein requests that the Court determine and order that he is entitled to recover from

Ross the reasonable attorney's fees and expenses he incurred, the amount ultimately to be

determined through a fee application under Fed. R. Civ. P. 54 and D. Kan. Rule 54.2.  He argues

that Ross agreed in the parties' Loan Documents to pay Rothstein's attorney's fees and expenses

incurred in not only enforcing Rothstein's loan rights and security interest, but also in defending

against Ross's claims and contentions.

Paragraph 11 of the Secured Promissory Note provides for the payment by Ross of all

costs of collection in the event of default:

> 11. **Collection Fees**. Except as otherwise provided herein, the Maker [Ross] shall
> pay all costs of collection, including reasonable attorneys' fees and all costs of
> suit and preparation for such suit (and whether at trial or appellate level), in the
> event the unpaid principal amount of this Note, or any payment of Interest is not
> paid when due, or in case it becomes necessary to protect the security for the
> indebtedness evidenced hereby, or for the foreclosure of trustee's sale by the
> Holder under the Pledge Agreement or in the event the Holder is made party to
> any litigation because of the existence of the indebtedness evidenced by this Note,
> or…to preserve, protect or realize upon any security for, or guarantee or surety of,
> such indebtedness whether suit be brought or not, whether through courts of
> original jurisdiction, as well as in courts of appellate jurisdiction, or through a
> bankruptcy court or other legal proceedings.

Paragraph 14 of the (Superseding) Pledge Agreement also requires Ross to pay all

reasonable out-of-pocket costs and expenses incurred by Rothstein in connection with, among

other things, any matters arising out of the parties' Loan Documents, including fees and expenses

incurred in defending Rothstein against Ross' claims:

14. *Expenses*. Pledgor [Ross] shall promptly pay to Pledgee [Rothstein] all reasonable out-of-pocket costs and expenses of Pledgee (both before and after the execution hereof) in connection with protecting or perfecting Pledgee's security interest in the Pledged Collateral or in connection with any matters contemplated by or arising out of this Pledge Agreement, the Forbearance Agreement or the Note, whether (i) to prepare, negotiate or execute any amendment to, modification of or extension of this Pledge Agreement, the Forbearance Agreement or the Note; (ii) to commence, defend, or intervene in any litigation or to file a petition, complaint, answer, motion or other pleadings necessary to protect the rights of Pledgee under this Pledge Agreement, the Forbearance Agreement or the Note; (iii) to take any other action in or with respect to any suit or proceeding (bankruptcy or otherwise) necessary to protect the rights of Pledgee under this Pledge Agreement, the Forbearance Agreement and the Note; (iv) to protect, collect, sell, take possession of, release or liquidate any of the Pledged Collateral; or (v) to attempt to enforce any rights of Pledgee to collect any of the secured Obligations, including all reasonable fees and expenses of attorneys and the allocated costs of internal counsel and paralegals, and in the case of enforcement, pay such reasonable costs and expenses for Pledgee.

Ross does not dispute that he is obligated by these contractual provisions to pay the reasonable out-of-pocket costs and expenses incurred by Rothstein in connection with enforcing his rights under the Agreement. The Court determines that Rothstein is entitled to recover his reasonable out-of-pocket costs and expenses, including attorney's fees, as provided in paragraph 14 of the (Superseding) Pledge Agreement. Determination of that reasonable amount shall be made pursuant to the fee application process set out in Fed. R. Civ. P. 54(d)(2) and D. Kan. Rule 54.2.

Accordingly, for the foregoing reasons, the undersigned Magistrate Judge recommends that Defendant Adam Rothstein's Motion for Summary Judgment as to Plaintiff's claim for Wrongful Disposition of Collateral, Rothstein's Right to a Deficiency Damages Award, and Entitlement to Attorney's Fees be granted. It is recommended that summary judgment on Ross's wrongful disposition of collateral claim should be entered in favor of Rothstein and a deficiency damages determination and award entered. It is further recommended that Rothstein is entitled

to recover his reasonable out-of-pocket costs and expenses as provided in paragraph 14 of the (Superseding) Pledge Agreement with the reasonable amount determination made pursuant to the fee application process set out in Fed. R. Civ. P. 54(d)(2) and D. Kan. Rule 54.2.

### D.      Fraud in the Inducement Counterclaim

Ross also requests in his motion that the Court enter summary judgment in his favor on Rothstein's counterclaim for fraud in the inducement.  He argues that Rothstein is not able to prove each and all of the elements of his counterclaim by the quantum of clear and convincing evidence required under Kansas law.  In response, Rothstein argues that Ross's motion should be denied as untimely filed, as it was filed more than seven months after the deadline for filing such motion.

#### 1.      Timeliness of Ross's Motion

In his Memorandum in Opposition, Rothstein argues that Ross's motion for summary judgment on the fraud in the inducement counterclaim should be denied as untimely because Ross failed to file the motion by the January 10, 2014 deadline for filing such motions, or to seek an extension of time to file it.  Notably, in his Reply, Ross chooses not to argue over whether his motion was untimely filed and makes no attempt to show good cause for not filing the motion by the initial dispositive motions deadline on January 10, 2014 (when Rothstein filed his summary judgment motion on all claims other than those related to Ross's wrongful disposition claim).  Instead, Ross argues simply that "even if" the motion was untimely filed:

> [T]here is no reason to preserve a claim for trial which Rothstein is demonstrably unable to prove by the standard of clear and convincing evidence required and where it even now appears that Rothstein has suffered no damages from any

alleged "fraud," having already received $345,220.99 upon a nine-month loan of $210,000.[57]

The Court finds that Ross's July 17, 2014 motion for summary judgment on Rothstein's fraud in the inducement claim is indeed untimely. The deadline to file the motion was January 10, 2014. Ross offers no excuse nor does he make a showing of excusable neglect for his failure to timely file his motion seeking summary judgment on the fraud claim.[58] Having filed his motion six months after the January 10, 2014 deadline, it is not enough for Ross to argue simply that he should prevail on the merits of summary judgment while ignoring entirely his significant delinquency.

Fed. R. Civ. P. 56(b) permits the filing of a motion for summary judgment "at any time until 30 days after the close of all discovery," unless a different time is set by local rule or court order. In this case, on May 22, 2013, the Court entered the original Scheduling Order (ECF No. 20), which set a January 10, 2014 deadline for the parties to file potentially dispositive motions such as motions for summary judgment. Thereafter, in its December 20, 2013 Amended Scheduling Order (ECF No. 114), the Court granted Ross's motion for leave to amend his complaint to add his claim for wrongful disposition of collateral and set a March 28, 2014 deadline for "filing any new dispositive motion on the new claim." On December 30, 2013, Rothstein filed an unopposed motion seeking to clarify and extend the January 10, 2014 deadline for filing a dispositive motion as to a "deficiency" determination. The Court granted that motion and extended the deadline for filing any dispositive motion *relating to Rothstein's claim for a*

---

[57] Pl.'s Reply (ECF No. 280) at 45.

[58] The applicable legal standard for evaluating Ross's failure to timely file his motion is excusable neglect. *See* Fed. R. Civ. P. 6(b)(1) (the court may extend the time "on motion made after the time has expired if the party failed to act because of excusable neglect").

*deficiency damages award or judgment* to March 28, 2014.[59]   Rothstein timely filed his second

motion for partial summary judgment on Ross's defamation claim by the January 10, 2014

deadline (ECF No. 132). The March 28 deadline for dispositive motions only as to Ross's

wrongful disposition claim and/or Rothstein's claim for deficiency damages was ultimately

extended to July 17, 2014 by subsequent Court orders.  But, those Court orders for extensions

occurred after the deadline for filing dispositive motions for all other claims had already expired

and did not revive or re-open that earlier deadline.  Ross did not seek any extension of the

January 10, 2014 deadline and his motion for summary judgment filed on July 17, 2014 on

Rothstein's fraud in the inducement counterclaim is therefore untimely.

### 2.      Merits of the Motion

Even were the Court inclined to excuse the untimeliness of Ross's motion, the Court

finds that genuine issues of material fact prevent summary judgment as to Rothstein's

counterclaim against Ross for fraud in the inducement.  To prevail on his claim for fraudulent

inducement, Rothstein must prove by clear and convincing evidence that (1) Ross made an

untrue statement of existing material fact, (2) Ross knew that the statement was untrue or

recklessly made with disregard for the truth, (3) Ross made the statement with the intent to

induce Rothstein to act on the statement, (4) Rothstein justifiably relied on the statement to his

detriment, and (5) Rothstein sustained injury as a result of his reliance.[60]

---

[59]  ECF No. 130 (emphasis added).

[60] *BHC Dev., LC v. Bally Gaming, Inc.,* 985 F. Supp. 2d 1276, 1288–89 (D. Kan. 2013) (citing *Stechschulte v. Jennings*, 297 Kan. 2, 298 P.3d 1083, 1096 (2013); PIK Civ. 4th 127.40).

The standard of proof where fraud is alleged is that of "clear and convincing evidence."[61] This standard means that a plaintiff must not only prove his cause by a preponderance of the evidence, but its evidence must be of a higher quality.[62] The phrase "clear and convincing" signifies:

> [T]he witnesses to a fact must be found to be credible; the facts to which the witnesses testify must be distinctly remembered; the details in connection with the transaction must be narrated exactly and in order; the testimony must be clear, direct and weighty; and the witnesses must be lacking in confusion as to the facts at issue.[63]

The Court finds that there is a genuine dispute as to material facts with respect to Rothstein's fraud in the inducement claim.  Specifically, factual issues exist as to whether Ross made untrue statements in his conversations with Rothstein leading up to Rothstein agreeing to make the $210,000 loan to Ross on March 29, 2012 (such as the statement that he was about to close on a financing, and that he had "other assets").  Factual issues also exist as to whether Ross concealed and/or failed to disclose certain material financial matters[64] (such as the $500,000 in IRS tax liens outstanding at the time of the loan at issue that would consume any back pay he was expecting from Infinity, and that board approval would be required before any payment of back pay).  These factual issues preclude entry of summary judgment on the fraud in the inducement claim.

---

[61] *Nordstrum v. Miller*, 227 Kan. 59, 65, 605 P.2d 545, 552 (1980).

[62] *Fox v. Wilson*, 211 Kan. 563, 579, 507 P.2d 252 (1973).

[63] *Modern Air Conditioning, Inc. v. Cinderella Homes, Inc.*, 226 Kan. 70, 78, 596 P.2d 816, 824 (1979).

[64] The Court is making no determination whether Ross had a legal duty to disclose this information, or whether Rothstein actually relied on the alleged fraudulent misrepresentations or failure to disclose.

Accordingly, for the foregoing reasons, the undersigned Magistrate Judge recommends that Ross's Motion for Summary Judgment Upon his Claim Against Defendant for Wrongful Disposition of Collateral Under K.S.A. 84-9-624 and 9-626 and Upon Defendant's Counterclaim for Fraud in the Inducement be denied.  It is recommended that summary judgment on Ross's wrongful disposition of collateral claim should be entered in favor of Rothstein.  It is further recommended that Ross's motion for summary judgment on Rothstein's fraud in the inducement claim be denied as untimely filed and because genuine factual issues exists that preclude summary judgment.

## **RECOMMENDATIONS**

IT IS THEREFORE RECOMMENDED THAT Plaintiff's First Motion for Order in Limine Excluding all Facts, Evidence, Testimony, Opinions and Inferences Offered by Defendant's Proffered Expert, Attorney Brian C. Underwood (ECF No. 261) be GRANTED IN PART AND DENIED IN PART.  Underwood should be precluded from offering at trial the four expert opinions set forth in his Affidavit.  The Court also disregards Underwood's four legal opinions asserted in his Affidavit in ruling on the pending cross motions for summary judgment. The Court will, however, consider the factual information provided by Underwood in his Affidavit, particularly as to the OTC markets and the OTCQB in particular, in making its own legal conclusions.

IT IS FURTHER RECOMMENDED THAT Defendant Adam Rothstein's Motion for Summary Judgment as to Plaintiff's claim for Wrongful Disposition of Collateral, Rothstein's Right to a Deficiency Damages Award, and Entitlement to Attorney's Fees (ECF No. 252) be GRANTED.  It is recommended that summary judgment be entered in favor of Rothstein on

Ross's wrongful disposition of collateral claim.  It is further recommended that upon adoption of this Report and Recommendation, the District Judge set an evidentiary hearing to determine the amount of the deficiency judgment.  It is further recommended that Rothstein is entitled to recover his reasonable out-of-pocket costs and expenses as provided in paragraph 14 of the (Superseding) Pledge Agreement, with the amount to be determined pursuant to the fee application process set out in Fed. R. Civ. P. 54(d)(2) and D. Kan. Rule 54.2.

IT IS FURTHER RECOMMENDED THAT Plaintiff's Motion for Summary Judgment Upon his Claim Against Defendant for Wrongful Disposition of Collateral Under K.S.A. 84-9-624 and 9-626 and Upon Defendant's Counterclaim for Fraud in the Inducement (ECF No. 255) be DENIED.  It is recommended that Ross's motion for summary judgment on Rothstein's fraud in the inducement claim be denied as untimely filed and because genuine factual issues exists that preclude summary judgment.

Respectfully submitted.

Dated in Kansas City, Kansas on this 23rd day of December, 2014.

*s/ Teresa J. James*
Teresa J. James
United States Magistrate Judge